IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| CANDICE G. JOHNSON, | | |
| Plaintiff, | | CIVIL ACTION NO. |
| v. | | 1:11-CV-00471-TWT-RGV |
| GWINNETT COUNTY SCHOOL DISTRICT, d.b.a. Gwinnett County Public Schools, | | |
| Defendant. | | |

## <u>ORDER FOR SERVICE OF FINAL REPORT AND RECOMMENDATION</u>

Attached is the Final Report and Recommendation of the United States Magistrate Judge made in this action in accordance with 28 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72(b), and this Court's Local Rule 72.1. Let the same be filed and a copy, together with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the Report and Recommendation within fourteen (14) days of the receipt of this Order. Should objections be filed, they shall specify with particularity the alleged error or errors made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party. The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the district court. If no objections are filed, the Report and

Recommendation may be adopted as the opinion and order of the district court and any appellate review of factual findings will be limited to a plain error review. United States v. Slay, 714 F.2d 1093 (11th Cir. 1983) (per curiam).

The Clerk is directed to submit the Report and Recommendation with objections, if any, to the district court after expiration of the above time period.

**IT IS SO ORDERED**, this 17th day of October, 2012.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CANDICE G. JOHNSON,

                Plaintiff,

v.

GWINNETT COUNTY SCHOOL
DISTRICT, d.b.a. Gwinnett County
Public Schools,

                Defendant.

CIVIL ACTION NO.

1:11-CV-00471-TWT-RGV

## **MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION**

Defendant Gwinnett County School District ("GCSD") moves for summary judgment in this action filed by plaintiff Candice G. Johnson ("Johnson"), alleging racial discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1983 ("§ 1983") and deprivation of due process under § 1983.  [Doc. 35].[1]  Johnson has filed a response in opposition to GCSD's motion, [Doc. 43], to which GCSD has replied, [Doc. 46]. For the reasons stated herein, it is **RECOMMENDED** that GCSD's motion for summary judgment, [Doc. 35], be **GRANTED**.

---

[1] The listed document and page numbers in citations to the record in this Report and Recommendation refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF, except that deposition transcripts are cited according to the transcript page number or exhibit number.

# I. FACTUAL BACKGROUND

## A.    Preliminary Matters

Under Local Rule 56.1B(1), GCSD is required to "include with the motion and brief a separate, concise, numbered statement of the material facts to which the movant contends there is no genuine issue to be tried." LR 56.1B(1), NDGa.; see also [Doc. 35-2 (GCSD's statement of facts)]. In order to be considered by the Court, each of the facts asserted by GCSD must be (1) supported by a citation to the evidence (including page or paragraph number); (2) supported by a citation to evidence, not to a pleading; (3) not stated as an issue or legal conclusion; and (4) specifically included in the separate statement of facts and not only set out in GCSD's brief. See LR 56.1B(1), NDGa.

Johnson has responded to GCSD's statement of facts. [Doc. 41]. In her response, Johnson may deny GCSD's statements of fact by (1) pointing out that GCSD's statement of fact does not comply with the Local Rules, is immaterial, or not supported by the cited evidence; (2) directly refuting GCSD's fact with concise responses supported by specific citations to the evidence (including page or paragraph number); or (3) stating a valid objection to the admissibility[2] of GCSD's

---

[2] "On motions for summary judgment, [a court] may consider only that evidence which can be reduced to an admissible form." Rowell v. BellSouth Corp., 433 F.3d 794, 800 (11th Cir. 2005); McMillian v. Johnson, 88 F.3d 1573, 1584-85 (11th Cir. 1996).

fact.  See LR 56.1B(2)a(2), NDGa.  Under Local Rule 56.1B(2), the Court accepts as true those facts which are admitted[3] or which are improperly denied.  LR 56.1B(2)a(2), NDGa.

Johnson also submitted her own statement of material facts which she contends present genuine issues for trial, [Doc. 42], to which GCSD has responded, [Doc. 48].  Johnson's statement of facts, like GCSD's, must comply with Local Rule 56.1B(1).  LR 56.1B(2)(b), NDGa.  In its response, GCSD may (1) object to the admissibility of the evidence upon which Johnson relies, (2) object because Johnson's evidence does not support her fact, (3) object on the ground that Johnson's fact is immaterial or does not otherwise comply with Local Rule 56.1B(1), or (4) concede that the Court can properly consider the fact.[4]  LR 56.1B(3), NDGa.  In its reply to Johnson's response opposing summary judgment, GCSD contends that Johnson impermissibly relies on inadmissable hearsay, unauthenticated evidence, and evidence that was neither produced nor identified in response to discovery requests, and asserts that Johnson's statement of facts and response to GCSD's statement of facts do not comply with Local Rule 56.1.  See [Doc. 46 at 2-10; Doc. 48].

---

[3] See [Doc. 41 admitting ¶¶ 1-7, 9, 11-19, 21-22, 24-27, 29-30, 35-40, 49, 52, 56, 66-76, 83, 86-87, 89, 91-97, 99-100, 105-06 and 109, and parts of ¶¶ 41, 45, 59, 85 and 107-08 of GCSD's statement, Doc. 35-2].

[4] See [Doc. 48, conceding consideration of ¶¶ 4, 17, and 21 of Johnson's statement, Doc. 42].

1. *Failure to Initially Disclose*

GCSD objects to consideration of Exhibit IVA, [Doc. 42-8 (documents related to Lori Guidi's ("Guidi") performance, deficiencies in her performance, and her disagreement with the administration)], IVB, [Doc. 42-9 (2009-2010 staff list with summary of racial composition)], IA & VIII, [Docs. 42-1 & 42-17 (tape recording of October 27, 2009, meeting regarding Johnson's partial professional development plan ("PDP")], and IV, [Doc. 42-7 (Guidi Aff.)], because Guidi was not identified during discovery as a person with knowledge of Johnson's case and the listed documents were not produced in response to discovery requests. See [Doc. 46 at 5-8]. In its interrogatory requests, GCSD specifically asked that Johnson identify each person with knowledge about her case and that she produce all recording and all documents that she intended to introduce as exhibits. See [Docs. 46-1, 46-2]; see also Fed. R. Civ. P. 26(a)(1)(A)-(B) (requiring the parties to disclose the names of all individuals likely to have discoverable information and a copy of all documents the party may use to support its claim); Fed. R. Civ. P. 26(e)(1)(a) (requiring Johnson to supplement her disclosures in the event she discovers information rendering an earlier response incomplete or incorrect). However, Johnson did not disclose Guidi as an individual with information about the case, see [Doc. 10 at 8-11], or her intent

to rely upon documents related to Guidi's employment or the staff composition of Shiloh Middle School ("SMS"),[5] see [id. at 12-13].

"If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1); see also United States v. Batchelor-Robjohns, No. 03-20164-CIV, 2005 WL 1761429, at *2 (S.D. Fla. June 3, 2005) (citations omitted) (noting that the "burden rests upon the non-producing party to demonstrate that its actions were substantially justified or harmless"). Johnson has offered no explanation for her failure to disclose this evidence in

---

[5] With respect to relevant documents, Johnson's initial disclosure merely lists categories of documents upon which she intends to rely. See [Doc. 10 at 12-13 (including "personnel documents regarding [Johnson's] employment," "[Johnson's] medical records," "documents related to internal complaints alleged by [Johnson]," "[d]ocuments pertaining to [Johnson's mitigation efforts," "pleadings and court papers," and "Electronic Recordings of Complaint of Discrimination")]. Essentially, these listed categories include only documents specific to Johnson's employment and actions, court papers, and a recording of her complaint of discrimination. See [id.]. Accordingly, none of these categories can be construed to include documents related to Guidi or other staff at the school. However, because this list explicitly names "Electronic Recordings of Complaint of Discrimination," the Court cannot find that Johnson necessarily failed to disclose the existence of the taped conversation, and because all evidence must be construed in the light most favorable to Johnson on a motion for summary judgment, see Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Knight v. Baptist Hosp. of Miami, Inc., 330 F.3d 1313, 1316 (11th Cir. 2003) (per curiam), GCSD's objection is overruled with respect to that exhibit. [Docs. 42-1, 42-17].

response to discovery requests or to supplement her discovery responses in accordance with the Federal Rules of Civil Procedure. Moreover, because discovery is closed, Johnson's failure to provide this evidence cannot be cured. Accordingly, the Court sustains GCSD's objections with respect to Guidi's affidavit, [Doc. 42-7], documents related to Guidi's employment, [Doc. 42-8], and a staff list of school employees with summary of racial composition, [Doc. 42-9], and this evidence will not be considered when evaluating GCSD's summary judgment motion, see Cooley v. Great S. Wood Preserving, 138 F. App'x 149, 161 (11th Cir. 2005) (per curiam) (unpublished); Roberts v. Scott Fetzer Co., No. 4:07-CV-80 (CDL), 2010 WL 3546499, at *6-9 (M.D. Ga. Sept. 7, 2010).

## 2. *Authentication Objections*

GCSD objects to Exhibits IA & VIII, [Docs. 42-1 & 42-17 (tape recording of October 27, 2009, meeting regarding Johnson's PDP)], as well as several other exhibits[6] on the basis that they were not properly authenticated. See [Doc. 46 at 3-

---

[6] These exhibits include: IB, [Doc. 42-2 (November 18, 2009, letter from John Trotter ("Trotter") to Dr. Eric Parker ("Dr. Parker"))], IC, [Doc. 42-3 (Johnson's annual evaluation summary for 2009-2010 school year dated March 30, 2010)], ID, [Doc. 42-4 (April 29, 2010, May 10, 2010, and June 21, 2010, letters from Johnson's counsel to GCSD requesting reconsideration of the decision not to renew her contract)], VIIA [Doc. 42-12 (partial PDP for Johnson and her response to Lisa Green's ("Green") evaluation)], IX, [Doc. 42-18 (Johnson's response to her PDP)], VIID, [Doc. 42-15 (various performance evaluations of Johnson from earlier in her career)], VIIE, [Doc. 42-16 (various performance evaluations of Johnson from earlier in her career)], X [Doc. 42-19 (December 3, 2009, fax from Dr. Parker to Joyce Spraggs

5]. "To be considered in support of or in opposition to a motion for summary judgment, a document must be authenticated, either by an affidavit that meets the requirements of [Federal Rule of Civil Procedure 56(e)] or in accordance with the Federal Rules of Evidence." <u>Rolison v. Sterling</u>, Civil Action No. 08-0389-CG-M, 2009 WL 2514294, at *8 (S.D. Ala. Aug. 13, 2009) (citation omitted); <u>see also</u> <u>Snover v. City of Starke, Fla.</u>, 398 F. App'x 445, 449 (11th Cir. 2010) (per curiam) (unpublished) (internal marks omitted) (<u>quoting</u> Fed. R. Evid. 901(a)) ("Authentication is a condition precedent to admissibility."). To authenticate evidence, the proponent must "produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). With respect to tape recordings in particular, the proponent must demonstrate "that the recording as played is an accurate reproduction of the relevant sounds previously audited by a witness." <u>United States v. Biggins</u>, 551 F.2d 64, 66 (5th Cir. 1977);[7] <u>see also</u> <u>KMS Rest. Corp. v. Wendy's Int'l, Inc.</u>, 194 F. App'x 591, 599-600 & n.10 (11th Cir. 2006) (per curiam) (unpublished) (affirming district court's authentication ruling where

---

("Spraggs") informing her of Johnson's complaints in the meeting and the letter from Trotter)], and XI [Doc. 42-20 (March 19, 2010 letter notifying Johnson that her contract would not be renewed)].

[7] In <u>Bonner v. City of Prichard, Ala.</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

the district court applied the <u>Biggins</u> authentication standard to tape recordings in a civil case); <u>Curdy v. Dep't of Veterans Affairs</u>, 124 F. App'x 656, 658 (Fed. Cir 2005) (per curiam) (unpublished) (finding a tape recording effectively authenticated in the civil context through the testimony of witnesses who were present at the meeting heard on the recording). The proponent must offer evidence relating to the "competency of the operator, the fidelity of the recording equipment, the absence of material deletions, additions or alterations in the relevant portions of the recording, and the identification of the relevant speaker." <u>Biggins</u>, 551 F.2d at 66. Johnson has failed to provide any affidavit or sworn testimony supporting a finding that her earlier performance evaluations, <u>see</u> [Docs. 42-15, 42-16], her annual performance evaluation for the 2009 to 2010 school year, <u>see</u> [Doc. 42-3], the fax from Dr. Parker informing Spraggs of her complaint, <u>see</u> [Doc. 42-19], or the letter informing Johnson that her contract would not be renewed, <u>see</u> [Doc. 42-20], are accurate representations of what she claims they are, and has thus not properly authenticated these exhibits, <u>see</u> Fed. R. Evid. 901(a). With respect to the tape recording, <u>see</u> [Docs. 42-1, 42-17], Johnson has not offered any of the required information regarding the capacity of the equipment or operator, and while she signed a document attesting that the recording is true and accurate, handwritten notes indicate that there are errors or corrections to be made in the transcript which are not further explained or

marked within the exhibit, see [Doc. 44-2 at 46]. Accordingly, this verification does not suffice as evidence that the recording was not altered or changed in a material way, see Biggins, 551 F.2d at 66, and the Court will not consider the tape or transcript, see [Docs. 42-1, 42-17]; see also Snover, 398 F. App'x at 448-49 (declining to consider a DVD offered in support of summary judgment where proponent "merely filed the DVD with the court and did not authenticate it"); Asia Economic Inst. v. Xcentric Ventures, LLC, No. CV 10-1360 SVW (PJWx), 2010 WL 4977054, at *12-13 (C.D. Cal. July 19, 2010) (declining to consider improperly authenticated tape recordings when considering summary judgment motion), or other improperly authenticated evidence, see [Docs. 42-3, 42-15, 42-16, 42-19, 42-20]; see also Saunders v. Emory Healthcare, Inc., 360 F. App'x 110, 113 (11th Cir. 2010) (per curiam) (unpublished) (citation omitted), for the purposes of this summary judgment motion.[8]

_____

[8] Although GCSD also objects to Johnson's response to her PDP, a portion of her PDP, and her letter refuting Green's evaluation on the grounds that they were not appropriately authenticated, see [Doc. 46 at 4; Doc. 42-12; Doc. 42-18], these documents were submitted in substantially the same form by GCSD as properly authenticated exhibits in connection with Johnson's deposition, compare [Doc. 42-18], with [Doc. 35-5 at 20-24]; [Doc. 42-12], with [Doc. 35-5 at 14-15, 18 (differing only because Johnson inserted Green's name into the response)]; see also [Doc. 36-2 at 120-25]. Because the evidence must be considered in the light most favorable to Johnson, see Adickes, 398 U.S. at 157; Knight, 330 F.3d at 1316, the Court will therefore consider her objections to GCSD's facts with reference to these duplicate, properly authenticated, exhibits, see Prop. Mgmt. & Invs. Inc. v. Lewis, 752 F.2d 599, 604-05 (11th Cir. 1985) (overruling authenticity objections where opponent also

### 3. *Hearsay Objections*

With respect to the remaining exhibits,[9] GCSD objects to Johnson's reliance on Exhibits ID, [Doc. 42-4 (April 29, 2010, May 10, 2010, and June 21, 2010, letters from Johnson's counsel to GCSD requesting reconsideration of the decision not to renew her contract)],[10] VIIA [Doc. 42-12 (partial PDP and response to Green's evaluation)],[11] and IX, [Doc. 42-18 (Johnson's response to her PDP)].[12] GCSD

_____

relied on the same evidence); see also Slone v. Judd, No. 8:09-CV-1175-T-27TGW, 2011 WL 1124618, at *3 (M.D. Fla. Mar. 25, 2011) (citation omitted) (noting that "whether the authentication requirement should be applied to bar evidence when its authenticity is not actually disputed is . . . questionable" when the opposing party relied upon the same evidence).

[9] Given that the Court has declined to consider several exhibits because they were either not properly disclosed or properly authenticated, see [Docs. 42-1 to 42-3, 42-7 to 42-9, 42-15 to 42-17, and 42-19 to 42-20], the Court will only consider hearsay objections raised with respect to exhibits still before the Court for consideration.

[10] GCSD objects to the fact that Johnson relies on these letters as evidence that she sent multiple letters to the Director of Human Resources and the Superintendent demanding an investigation but that her requests were ignored. See [Doc. 41 ¶ 110].

[11] GCSD objects to the fact that Johnson relies on this response as evidence that her students did not remain off task and her room was not in disarray during Dr. Parker's visit at the beginning of the 2009-2010 school year, see [Doc. 41 ¶ 32], as evidence tending to refute the observations Green made during her evaluation in September of 2009, [id. ¶¶ 41-48], as evidence that her Caucasian evaluators did not note the same deficiencies in their evaluations, [id. ¶ 104], and as evidence that she continued to bring claims of race discrimination, [id. ¶ 110].

[12] GCSD objects to the fact that Johnson relies on this rebuttal as evidence that GCSD's legitimate explanations for placing her on a PDP and not renewing her contract were pretext because she did not deserve the rating she got on her evaluations, [Doc. 41 ¶¶ 53, 55], as evidence that she continued to bring claims of

contends that these exhibits are "written or oral assertions of a person made in a non-testimonial environment and that the assertions are being offered to prove the truth of the information contained."[13] Fed. R. Evid. 801; see also [Doc. 46 at 2-3].

The Court agrees that Johnson's response to Green's evaluation and the rebuttal to the PDP, which are non-testimonial statements offered as evidence of the circumstances in her classroom during Dr. Parker's visit and Green's evaluation, see [ Doc. 42 ¶¶ 32, 41-48, 53, 55], constitute impermissible hearsay and thus sustains GCSD's objection as to these documents.  However, the Court does not find that the

---

race discrimination, [id ¶¶ 62-64, 102, 110], and as evidence that she submitted a rebuttal to her PDP, [id. ¶ 60].

[13] Although GCSD generally asserts that it believes Exhibit VI, [Doc. 42-11 (letter from Dr. Parker relating a list of employees who received documentation for low performance in 2009 to 2010, their race, and their status for the next year)], VIIB, [Doc. 42-13 (George Allen's ("Allen") evaluation)], and VIIC, [Doc. 42-14 (Sharon Mendez's ("Mendez") evaluation)], are also impermissible hearsay, it does not set forth a specific objection or identify which of Johnson's responses relying on these exhibits constitute hearsay.  Moreover, GCSD also relies upon Mendez's and Allen's evaluations, see [Doc. 35-5 at 25-26], which as standard teacher evaluation forms fall under the business records exception to the hearsay rule, see Fed. R. Evid. 803(6); [Doc. 35-10 ¶ 14 (Mendez noting that she has conducted over 100 teacher evaluations in the normal course of her duties as an administrator and averring that the attached copy, identical to that upon which Johnson relied, was accurate); Doc. 35-9 (Allen testifying that he has conducted over 300 teacher evaluations in the normal course of his duties as an administrator and averring that the attached copy, identical to that upon which Johnson relied, was accurate)]; see also Komel v. Arther J. Gallagher & Co., 833 F. Supp. 2d 855, 850 (N.D. Ill. 2011) (considering performance reviews as business records under the hearsay rule).  Accordingly, GCSD's objections with respect to these exhibits are overruled.

letters counsel sent to the administration constitute hearsay because those letters are not offered as evidence of what actually happened, but to show that the letters were, in fact, sent and that Johnson's complaints continued. See United States v. Persico, 645 F.3d 85, 103 (2d Cir. 2011) (affirming district's court's ruling that testimony was admissible where it was offered to show the fact that the witness made the accusations and not that the accusations were true); United States v. McIntyre, 997 F.2d 687, 702-03 & n.17 (10th Cir. 1993); see also [Doc. 41 ¶¶ 62, 64, 102, 110 (relying on the letter to show that she continued to complain about the harassment)]. Likewise, to the extent Johnson relies upon the rebuttal to her PDP or her response to Green's evaluation to show that she disagreed with her evaluation and continued to bring claims of race discrimination, see [Doc. 41 ¶¶ 60, 62-64, 102, 110], such use is nonhearsay and GCSD's objections to the evidence in this regard are overruled.

**4.** *Compliance with the Local Rules*

GCSD contends that Johnson's response to GCSD's statement of material facts and Johnson's own statement of material facts fail to comply with the requirements of the Local Rules. See [Doc. 46 at 8-9]. The Court agrees that many of Johnson's responses to GCSD's statement of material facts fail to comply with Local Rule 56.1B(2)a(2) in that they are not supported by specific citations to the evidence or do not directly refute the GCSD's stated fact, and those facts are therefore deemed

admitted.[14]  LR 56.1B(2)a(2), NDGa.  Additionally, because the Court has sustained

several of GCSD's evidentiary objections, many of Johnson's own statements of fact

that create genuine issues for trial are consequently unsupported by evidence and

therefore will not be considered by the Court.[15]

## B.    Statement of Facts

Johnson, who is Caucasian, began her employment with the GCSD[16] in 1994

as an interpreter and then worked as a paraprofessional within the GCSD for eleven

---

[14]  See [Doc. 41 ¶¶ 8, 20, 31, 34, 61, and 85 (failing to cite a page or paragraph number within lengthy referenced exhibits), 28, 23, 32-34, 42, 47, and 84 (not directly refuting GCSD's fact)].

[15]  See [Doc. 42 ¶¶ 1-9, 11-16, 19].

[16]  The GCSD is a political subdivision of the state of Georgia, O.C.G.A. § 28-5-48(4), and is governed by the Gwinnett County Board of Education (the "Board") which has been vested with broad state constitutional authority to manage the affairs of the GCSD; see Boykins v. Fairfield Bd. of Educ., 492 F.2d 697, 702 (5th Cir. 1974). The Board sets policies that govern the operations of GCSD, O.C.G.A. § 20-2-59, and has broad constitutional authority to interpret its own policies and procedures, GA. CONST. art. 8, § 5, ¶ 12; see also Wood v. Strickland, 420 U.S. 308, 326 (1975).  The daily operations of GCSD are managed by an appointed Superintendent who interprets, applies, and enforces the policies of the Board.  O.C.G.A. § 20-2-109.  At all times relevant to this case, J. Alvin Wilbanks ("Superintendent Wilbanks") served as Superintendent of the GCSD.  [Doc. 35-11 (Camp Aff.) ¶ 5].  Organizationally, the school district consist of six divisions, including Business and Finance, School Leadership and Operational Support, Teaching and Learning Support, Human Resources ("HR"), Facilities and Operations, and Information Management, plus the office of the Superintendent.  [Id. ¶ 4].  HR oversees the employment needs of the GCSD.  [Id. ¶¶ 2, 4].

years.  See [Doc. 36-1 (Johnson Dep.) at 2, 24].[17]  In August of 2007, she was hired as a special education teacher, assigned to McKendree Elementary School.  [Id. at 27-28; Doc. 35-5 at 2].  In the fall of 2007, Johnson was moved to SMS where she was employed as an eighth grade special education teacher.[18]  [Doc. 36-1 at 30-31].  During the 2007-2008 and 2008-2009 school years at SMS, Johnson taught a total of four classes during the school day, but three were collaborative classes where Johnson was in the classroom with another teacher, Hilda Tate ("Tate"), an African-American.  [Id. at 34-36, 47-48; Doc. 35-5 at 3]; see also [Doc. 35-8 (Green Aff.) ¶ 10].  In other words, Johnson was only solely responsible for one class.  [Doc. 36-1 at 34-36, 47-48; Doc. 35-5 at 3]; see also [Doc. 35-8 ¶ 10].

GCSD has a policy prohibiting discrimination on the basis of race and retaliation.  [Doc. 35-11 ¶ 8 & Exs. 1-2 (comprising Policy GAAA, the "Equal Opportunity Policy" and Policy GAE, the "Complaints and Grievances Procedure")].  The policy requires that employees who believe they have been discriminated

---

[17] Johnson's deposition was filed in three parts, and comprises Doc. 36-1 to Doc. 36-3.

[18] Prior to her employment at SMS, while working as a paraprofessional of Maxwell High School of Technology, Johnson made racial statements that offended a student, and her behavior was reported to the Principal of the school who issued her a letter of direction.  [Doc. 36-2 at 150-51; Doc. 35-5 at 30].

against "make a complaint in accordance with applicable procedures."[19] [Id. ¶ 8]. All employees, including Johnson, are made aware of the policy and are required to initial that they have read the policy. [Id.]; see also [Doc. 36-2 at 177; Doc. 35-5 at 2, 6]. GCSD had also posted posters in the workplace noting that "Equal Opportunity is the Law" and providing "Notice to Students and Employees" about who they should contact if they felt they were being discriminated against. See [Doc. 36-1 at 55-57; Doc. 35-5 at 8-10]. Training is provided to all employees annually on the grievance process, see [Doc. 35-7 (Parker Aff.) ¶ 6; Doc. 35-11 ¶ 9 & Ex. 2], and Johnson attended this training in the 2009-2010 school year, see [Doc. 36-1 at 53; Doc. 35-5 at 6].

---

[19] According to GCSD's procedure, an employee "must present a complaint in person and/or writing" to his or her immediate supervisor within 10 days of the most recent incident upon which the complaint is based. [Doc. 35-5 at 37]. But see [id. at 36 (stating that "[t]he initial complaint shall be in writing")]. The complaint must include the mailing address of the complainant to which all notices and other documents may be mailed, the clearly stated intent of the complainant to use the complaint procedure, a reference to the rule or policy that has been violated or misapplied, a brief statement of the facts, and a statement of the relief desired. [Id. at 37]. The forms necessary to file a grievance under this policy are maintained by the principal of the school. [Doc. 33 at 131]. The administrator accepting the complaint must record the date of filing and conduct a hearing and issue a decision within 10 days of receiving the complaint. [Doc. 35-5 at 37]. The policy then outlines the appeals process, first to the division of HR, then to the office of the Superintendent, then to the Local Board of Education, and then to the State Board of Education. [Id. at 37-38].

During the 2009-2010 school year, Johnson did not have any collaborative classes, and was instead the teacher of record for all four special education classes she taught.  [Doc. 36-1 at 59-61; Doc. 35-5 at 11; Doc. 35-8 ¶ 10].   Johnson taught three eighth grade language arts classes and one seventh grade language arts class on her own.  [Doc. 36-1 at 59-61; Doc. 35-5 at 11; Doc. 35-8 ¶ 10].  Johnson was directly supervised by Assistant Principal Green, an African-American.  [Doc. 36-1 at 61; Doc. 35-7 ¶ 10; Doc. 35-8 ¶¶ 1, 4].

At the beginning of the 2009-2010 school year, Green sought to assist and advise Johnson, providing suggestions for classroom management, encouraging Johnson to seek support and guidance from two other successful special education teachers, and offering to meet with Johnson at any time to discuss additional support or concerns.  [Doc. 36-1 at 76-77; Doc. 35-5 at 12; Doc. 35-8 ¶ 10].  Green even met with Johnson in September of 2009 in order to ask her what she needed to be successful.  [Doc. 36-1 at 76-80; Doc. 35-5 at 12; Doc. 35-8 ¶10].  In addition, Dr. Parker, the Principal of SMS who is an African-American,[20] visited each classroom in an effort to get to know the teachers and to get an initial assessment of what was

---

[20]   Dr. Parker was appointed Principal of SMS beginning in the 2009-2010 school year.  [Doc. 35-7 ¶¶ 1, 3].

going on within the school.  [Doc. 36-1 at 79-80; Doc. 33[21] (Parker Dep.) at 21-24; Doc. 35-7 ¶¶ 1, 3, 9].

On September 29, 2009, Green formally evaluated Johnson using the Georgia Teacher Observation Instrument ("GTOI").[22]  [Doc. 36-2 at 118; Doc. 35-5 at 13; Doc. 35-7 ¶ 10; Doc. 35-8 ¶ 14].  In this evaluation, Green concluded that Johnson "needed improvement" in four areas of the GTOI: promoting engagement, monitoring progress, use of time, and appropriate behavior.  [Doc. 36-2 at 118-20; Doc. 35-5 at 13; Doc. 35-7 ¶ 10; Doc. 35-8 ¶ 27].  In other words, Johnson did not demonstrate satisfactory performance meeting minimal standards in these areas.  [Doc. 36-2 at 118-20; Doc. 35-5 at 13; Doc. 35-7 ¶ 10; Doc. 35-8 ¶ 27].  Johnson submitted a rebuttal to Green's evaluation.  [Doc. 36-2 at 120; Doc. 35-5 at 14-15].

---

[21] Parker's deposition was filed in two parts, and comprises Doc. 33 and Doc. 33-1.

[22] The GTOI sets forth minimum expectations and any teacher who cannot meet those minimum expectations needs to improve his or her performance or student achievement will suffer.  [Doc. 35-7 ¶ 8; Doc. 35-8 ¶ 15; Doc. 35-9 (Allen Aff.) ¶ 10; Doc. 35-10 (Mendez Aff.) ¶ 10].  On the day that Green evaluated Johnson, all students present in her classroom had been identified as needing special education services under the Individuals with Disabilities Education Act.  [Doc. 35-8 ¶ 17].

As a result of this evaluation, Johnson was issued a PDP.[23]  [Doc. 36-2 at 128; Doc. 35-5 at 16-18; Doc. 35-7 ¶ 10; Doc. 35-8 ¶ 28; Doc. 35-11 ¶¶ 10-11].  Johnson's PDP was a required plan for specific needs development, and it applied from October 27, 2009, until January 31, 2010, but could be extended if necessary.  [Doc. 36-2 at 141-43; Doc. 35-5 at 16-18; Doc. 35-7 ¶ 10; Doc. 35-8 ¶ 33].  The PDP enumerated specific objectives for improvement in five areas: (1) quality of classroom instruction, (2) student engagement, (3) prompt completion of detailed lesson plans, (4) classroom environment, and (5) case load management.  [Doc. 36-2 at 141-43; Doc. 35-5 at 16-18; Doc. 35-7 ¶ 10; Doc. 35-8 ¶ 33].  On October 27, 2009, Johnson had a meeting with Dr. Parker and Green to review her PDP, and the PDP was explained to Johnson.  [Doc. 36-2 at 143; Doc. 35-7 ¶ 11; Doc. 35-8 ¶ 35].  During this meeting, Johnson voiced disagreement with her PDP and complained that it was the result of racial discrimination, but Dr. Parker dismissed her comments and

---

[23] Like Johnson, other employees who had unsatisfactory evaluations were placed on PDPs.  [Doc. 35-7 ¶ 16; Doc. 35-8 ¶ 37; Doc. 5 ¶ 17].  In the special education department at SMS, three other teachers, including Anthony Williams ("A. Williams"), an African-American male, Valerie Clark ("Clark"), an African-American female, and Robin Griffin ("Griffin"), a Caucasian female, were placed on PDPs. [Doc. 35-7 ¶ 16; Doc. 35-8 ¶ 37; Doc. 5 ¶ 17].  Each teacher was placed on a PDP after receiving three or more needs improvement ratings on formal evaluations, and their PDPs had similar requirements to address the deficiencies noted in their classrooms. [Doc. 35-7 ¶ 16; Doc. 35-8 ¶ 37; Doc. 5 ¶ 17]. A Caucasian eighth-grade language arts teacher was also placed on a PDP for deficient performance.  See  Doc. 35-7 ¶ 17].

ended the meeting.[24]  [Doc. 36-2 at 143-44, 171].  Accordingly, it is clear that Dr.

Parker was aware of Johnson's race discrimination claims after the decision had been

made to put Johnson on a PDP and he knew of subsequent efforts by Johnson to

pursue those complaints of discrimination.[25]  [Doc. 33 at 58, 120-22].  Following this

---

[24] While Johnson contends that her verbal complaints to Dr. Parker in this meeting constituted a grievance or complaint in accordance with GCSD's policy, see [Doc. 43 at 11], Dr. Parker did not believe her statements constituted a formal grievance, see [Doc. 33 at 60-64 (stating that he felt the comments were accusations that he was a racist or that the meeting had been called for racial reasons), 86-90 (categorizing Johnson's comments as "untrue accusations" and "a racial assault on [Dr. Parker]")), 92-94, 100-01 (asserting that Johnson's comments were "name calling"), 106-07 (noting that he tried to reassure Johnson that her evaluation was based on performance, not race), 113].  Johnson asserts that Dr. Parker's failure to process her complaints during and after this meeting was not in compliance with GCSD's policies and effectively kept her from accessing the policy and formally submitting a grievance.  [Doc. 43 at 11].  It is undisputed that Johnson did not complain to SMS Assistant Principals Allen or Mendez that she was being mistreated on account of her race, and at no time did she attempt to file a grievance with Allen or Mendez.  [Doc. 35-9 ¶ 24; Doc. 35-10 ¶ 17].

[25] There is also record evidence that Johnson raised concerns regarding racial discrimination in the rebuttal to her PDP and in a letter sent to Dr. Parker and GCSD on her behalf by Trotter, who worked with Metro Area Classroom Educators as an advocate for teachers, on November 18, 2009.  See [Doc. 33 at 126-29; Doc. 36-2 at 180-81; Doc. 35-5 at 20-24].

meeting, Johnson submitted a rebuttal to the PDP.[26]  [Doc. 36-2 at 127; Doc. 35-5 at 20-24].

Dr. Parker eventually mentioned Johnson's comments at the October 27, 2009, meeting to Spraggs,[27] an African-American and GCSD's equality compliance officer, who met with Johnson on December 16, 2009.[28]  See [Doc. 36-2 at 177-78, 183-84, 187; Doc. 33 at 125-26].  Dr. Parker also asked Allen, a Caucasian Assistant Principal at SMS, to evaluate Johnson, and Allen conducted this evaluation on November 18, 2009.  [Doc. 36-2 at 145-46; Doc. 35-5 at 25; Doc. 35-7 ¶14; Doc. 35-9 ¶¶ 1, 8].  Allen concluded that Johnson "needed improvement" in three of the same areas identified

---

[26] From her deposition testimony, it appears that Johnson felt that she was already doing what the PDP said that she needed to do and that the PDP was not tailored to her specific needs.  [Doc. 36-2 at 122-42].  She also alleged that compliance with the PDP was impossible because she was not provided with copies of the books the PDP asked her to read and because the class she was asked to attend was for new teachers and had already begun at the time her PDP was issued.  See [id.].

[27] Dr. Parker also testified that he mentioned Johnson's comments regarding race to Derick Williams ("Williams"), the HR staffing director.  [Doc. 33 at 76].  He also testified that Williams is the individual who received his recommendations regarding renewal of teachers' contracts.  [Id. at 208].

[28] According to Johnson, Spraggs also "refused to investigate" despite the fact that she had filed a complaint, a conclusion Johnson reached because she never saw any documentation of any follow up.  [Doc. 36-2 at 185-86].  Johnson contends that the decision not to investigate was the result of Spraggs' racial animus against her, manifested because Spraggs "lost her temper," "yelled" and "immediately denied that there was any discrimination."  [Id.].  Johnson "sincerely believe[s] that there was no follow-up because [she is] white."  [Id.].

by Green: promoting student engagement, managing the learning environment, and use of time and appropriate behavior.[29] [Doc. 36-2 at 145-46; Doc. 35-5 at 25; Doc. 35-7 ¶ 14; Doc. 35-9 ¶ 15]. Allen also noted several concerns with Johnson's classroom performance, including the quality of her instruction, her ability to transition to new assignments effectively, and the number of off-task students during her academic instruction. [Doc. 35-5 at 25; Doc. 35-9 ¶ 14]. Allen stated that he thought it would be difficult for students to learn in her classroom. [Doc. 35-5 at 25]. Johnson did not attach any comments or submit a rebuttal to Allen's evaluation, and does not believe that Allen had any racial animus toward her. [Doc. 36-2 at 145-46; Doc. 35-9 ¶ 18].

According to GCSD, Johnson did not complete any of the requirements outlined in her PDP.[30] [Doc. 36-2 at 128-43; Doc. 35-8 ¶ 35]. In other words, GCSD contends that Johnson did not address her supervisor's comments regarding student engagement in the manner proscribed by the PDP, she did not attempt to modify her lesson plans pursuant to the suggestions of the PDP, she did not complete the

---

[29] As an administrator, Allen has completed over 300 evaluations of teachers, and he testified that he rarely observes a teacher whose performance "needs improvement" as measured by the GTOI. [Doc. 35-9 ¶¶ 16-17]. Overall, Allen testified that he would characterize the level of Johnson's instruction as significantly below his expectations and the expectations set forth by GCSD. [Id.].

[30] However, as Johnson repeatedly points out, she was "found to have performed duties and responsibilities assigned as of April 1st, 2010." See [Doc. 41 ¶¶ 77-82, 88].

teacher observations required by her PDP, she did not read the books required for successful completion of her PDP, and she failed to attend the Professional Development Sessions specified in her PDP.  [Doc. 36-2 at 128-30, 133-40; Doc. 35-5 at 19; Doc. 35-8 ¶¶ 34-35].   Accordingly, as a result of Johnson's poor performance and noncompliance, Dr. Parker submitted Johnson's name to HR in January of 2010 recommending non-renewal of her teaching contract.[31]  [Doc. 35-7 ¶ 15; Doc. 33 at 157].  Dr. Sidney Camp ("Dr. Camp"), who is Caucasian and the executive director of HR Staffing, reviewed and approved Dr. Parker's recommendation of non-renewal, and later notified Johnson that he would be recommending to Superintendent Wilbanks that her teaching contract not be renewed for the 2010 to 2011 school year.  [Doc. 35-7 ¶ 15; Doc. 35-11 ¶¶ 1, 12].

Following Dr. Parker's recommendation to not renew Johnson's contract, Mendez, a Caucasian Assistant Principal at SMS, evaluated Johnson on February 12, 2010, and gave her satisfactory marks on the evaluation, but still noted concerns regarding Johnson's classroom management and instruction.  [Doc. 36-2 at 147-48; Doc. 35-5 at 26; Doc.  35-10 ¶¶ 1, 12].   With respect to Johnson's classroom

---

[31] Two other special education teachers who did not comply with their PDPs, Griffin and A. Williams, were also recommended for non-renewal; however, both Clark and the Caucasian language arts teacher, who complied with their PDPs, were recommended for renewal, although the language arts teacher resigned.  <u>See</u> [Doc. 35-7 ¶¶ 16-18; Doc. 35-8 ¶ 37].

management abilities, Mendez noted that several students were disruptive and off-task.  [Doc. 36-2 at 147-48; Doc. 35-5 at 26; Doc. 35-10 ¶ 13].  Specifically, she saw Johnson redirect the behavior of one off-task student, but the student persisted and Johnson did not engage in further discipline.  [Doc. 36-2 at 147-48; Doc. 35-5 at 26; Doc.  35-10 ¶ 13].  Mendez believed that Johnson should have given formal consequences to the student continuing to disrupt classroom instruction.  [Doc. 36-2 at 147-48; Doc. 35-5 at 26; Doc.  35-10 ¶ 13].  Johnson did not attach any comments or submit a rebuttal to Mendez's evaluation.  [Doc. 36-2 at 148; Doc. 35-5 at 26; Doc. 35-10 ¶ 15].

Johnson filed her charge with the Equal Employment Opportunity Commission ("EEOC") on April 23, 2010, alleging discrimination and retaliation on the basis of her race.[32]  [Doc. 36-2 at 157; Doc. 35-5 at 33].  Johnson was issued a right to sue letter on November 19, 2010, [Doc. 36-2 at 171], and filed this action on February 16, 2011, [Doc. 1], amending her complaint on April 20, 2011, [Doc. 5].  In

---

[32] In this charge, Johnson complained that she was discriminated against on the basis of her race and retaliated against for complaining about discrimination. [Doc. 35-5 at 33].  She based her claim on the fact that she spoke with Green in October of 2009 about discriminatory remarks from two teachers, and Green then gave her an unsatisfactory rating in her teaching evaluation.  See [id.].  She also describes how she met with Dr. Parker and Green about her PDP and complained about discrimination and how her complaint was eventually referred to Spraggs. [Id.].  She alleges that she was informed on or about March 30, 2012, that her contract would not be renewed for the following school year and that "[n]o reason was given for the non-renewal."  [Id.].

her amended complaint, Johnson asserts that Dr. Parker, Green, and Tate were all personally involved in discriminating against her during the 2009-2010 school year. [Id. ¶ 9]. She alleges that Tate and Greene were rude and dismissive toward her on the basis of her race.[33] [Id. ¶ 11]. She further alleges that Green gave her a poor evaluation in October of 2009 because she was white, and that this evaluation was used as the impetus to put her on a PDP. [Id. ¶¶ 15-16].

Johnson further alleges that at her October, 27, 2009, meeting with Dr. Parker and Green to discuss the PDP, she objected to the plan and stated that she believed she was being discriminated against on the basis of her race,[34] but that Dr. Parker dismissed her concerns instead of handling them in a manner consistent with GCSD's policy. [Id. ¶¶ 17-24]. She asserts that Dr. Parker then retaliated against her for raising complaints of discrimination by "ceas[ing] all communication with [her]."

---

[33] See [Doc. 36-1 at 85-100; Doc. 36-2 at 101-13] for a description of Johnson's alleged conflicts with Tate. Johnson's deposition testimony also includes a description of events at a staff development meeting where she asserts that two African-American teachers were continually talking throughout the meeting while she was trying to take notes. [Doc. 36-2 at 104-05]. When she asked them to be quiet, she alleges they told her "shut up white teacher. Nobody cares what you have to say." [Id. at 105]. Although Johnson asserts that she reported this incident to Tate and Greene, see [id. at 106-07], she asserts that no action was taken on her behalf by these individuals, and that Tate in fact told her at one point that she "needed to just go back here [she] came from," [id. at 110-11].

[34] Johnson also alleges that she continued to raise complaints of racial discrimination when she filed a rebuttal to the PDP. [Doc. 5 ¶¶ 25, 27].

[Id. ¶¶ 25, 35]. Johnson also alleges that when she recognized Dr. Parker had ignored her earlier complaint, she submitted another complaint in writing on November 18, 2009, with the help of an Atlanta teachers' organization, [id. ¶ 28], and that Dr. Parker eventually referred this written complaint to GCSD's central office, [id. ¶ 29]. She alleges that this referral resulted in a meeting with Spraggs, but that Spraggs also ignored her complaints, [id. ¶ 31], and that she was ultimately retaliated against when her contract was not recommended for renewal in March of 2010, resulting in her losing her job at SMS and being ineligible for a transfer to Maxwell High School, [id. ¶¶ 36, 38].

## II. SUMMARY JUDGMENT STANDARD

In deciding a motion for summary judgment, the Court views all evidence in the light most favorable to and draws all reasonable inferences in the favor of the non-moving party. Adickes, 398 U.S. at 157; Cargo v. Ala., Bd. of Pardons & Parole Div., 391 F. App'x 753, 754 (11th Cir. 2010) (per curiam) (unpublished); Knight, 330 F.3d at 1316. "Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law." McCurdy v. DeKalb Cnty., Civil Action File No. 1:09-CV-1989-TWT, 2010 WL 5101405, at *1 (N.D. Ga. Dec. 8, 2010) (citing Fed. R. Civ. P. 56(c)); see also Young v.

FedEx Express, 432 F. App'x 915, 916 (11th Cir. 2011) (per curiam) (unpublished);

Penley v. Eslinger, 605 F.3d 843, 848 (11th Cir. 2010). The party moving for summary

judgment bears the initial burden of demonstrating the absence of any genuine issue

of material facts, upon which the non-moving party must then submit specific facts

showing a genuine issue for trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 323

(1986); Bagwell v. Peachtree Doors & Windows, Inc., Civil Action File No.

2:08–CV–0191–RWS-SSC, 2011 WL 1497831, at *10 (N.D. Ga. Feb. 8, 2011), adopted

by 2011 WL 1497658, at *1 (N.D. Ga. Apr. 19, 2011); Premier Assocs., Inc. v. EXL

Polymers, Inc., No. 1:08-cv-3490-WSD, 2010 WL 2838497, at *8 (N.D. Ga. July 19,

2010).

"[A] party opposing a properly supported motion for summary judgment may

not rest upon mere allegation or denials of [her] pleading, but must set forth specific

facts showing that there is a genuine issue for trial." Jackson v. B & L Disposal, Inc.,

425 F. App'x 819, 820 (11th Cir. 2011) (per curiam) (unpublished) (alteration in

original) (citation and internal marks omitted); see also Shuler v. Ingram & Assocs.,

441 F. App'x 712, 715 (11th Cir. 2011) (per curiam) (unpublished); Bryant v. U.S. Steel

Corp., 428 F. App'x 895, 897 (11th Cir. 2011) (per curiam) (unpublished).

"Speculation or conjecture cannot create a genuine issue of material fact." Shuler,

441 F. App'x at 715 (citation omitted); see also Howard v. Or. Television, Inc., 276 F.

App'x 940, 941 (11th Cir. 2008) (per curiam) (unpublished) (emphasis, citation, and internal marks omitted) ("Speculation does not create a genuine issue of fact."); Goodman v. Ga. Sw., 147 F. App'x 888, 891 (11th Cir. 2005) (per curiam) (unpublished) (citation and internal marks omitted) ("[A]ll reasonable inferences arising from the undisputed facts should be made in favor of the nonmovant, but an inference based on speculation and conjecture is not reasonable."). "Moreover, the non-moving party cannot create a genuine issue through evidence that is 'merely colorable' or 'not significantly probative.'" Morales v. Ga. Dep't of Human Res., 446 F. App'x 179, 181 (11th Cir. 2011) (per curiam) (unpublished) (citation omitted). "But, [w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, summary judgment for the moving party is proper." Premier Assocs., Inc., 2010 WL 2838497, at *9 (alteration in original) (citation and internal marks omitted).

## III. DISCUSSION

Title VII makes it unlawful for a covered employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII also provides that it is "an unlawful employment practice for an employer to discriminate against any of his employees

or applicants for employment" because the employee has opposed unlawful

discrimination by his employer or "has made a charge, testified, assisted, or

participated in any manner in an investigation, proceeding, or hearing" concerning

unlawful discrimination by his employer.[35]   42 U.S.C. § 2000e-3(a).  Section 1981

provides that "[a]ll persons within the jurisdiction of the United States shall have the

same right . . . to make and enforce contracts[[36]] . . . as is enjoyed by white citizens,"

42 U.S.C. § 1981(a), and "prohibits an employer from retaliating against its employee

in response to the employee's complaint of race-based discrimination," Braswell v.

Allen, 586 F. Supp. 2d 1297, 1310 (M.D. Ala. 2008).  Title VII and § 1981 use the same

analysis for discrimination and retaliation claims.  See Worley v. City of Lilburn, 408

F. App'x 248, 250 (11th Cir. 2011) (per curiam) (unpublished) (citations omitted)

("The elements required to establish retaliation claims under § 1981 are the same as

---

[35] These two prohibitions on retaliation are generally known as the opposition clause and the participation clause, respectively. EEOC v. Total Sys. Servs., Inc., 221 F.3d 1171, 1174 (11th Cir. 2000); Enadeghe v. Ryla Teleservices, Inc., Civil Action File No. 1:08-CV-3551-TWT, 2010 WL 481210, at *8 (N.D. Ga. Feb. 3, 2010), adopted at *1 (citation and internal marks omitted). This distinction is important because the requirements and protections under each clause are different. See Merritt v. Dillard Paper Co., 120 F.3d 1181, 1187 (11th Cir. 1997) (noting that the participation clause is "not so limited" as the opposition clause).

[36] "Make and enforce contracts" encompasses "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

those required for Title VII claims."); <u>Bryant v. Jones</u>, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009) (noting that discrimination claims brought under the Equal Protection Clause, § 1981, or Title VII are subject to the same standards and employ the same analytical framework). Section 1983 is the vehicle through which plaintiffs must pursue a § 1981 claim against state actors. <u>Braswell</u>, 586 F. Supp. 2d at 1310; <u>see also</u> <u>Blackledge v. Ala. Dep't of Mental Health & Mental Retardation</u>, Civil Action No. 2:06cv321-ID, 2007 WL 3124452, at *7 n.7 (M.D. Ala. Oct. 25, 2007) (citations and internal marks omitted) ("§ 1983 contains the sole cause of action against state actors for violations of § 1981.").

Where, as here, there is no direct evidence of discrimination or retaliation,[37] the Court evaluates claims by using the burden-shifting framework articulated in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-04 (1973). <u>Burke-Fowler v. Orange Cnty., Fla.</u>, 447 F.3d 1319, 1323 (11th Cir. 2006) (per curiam). Under this framework, Johnson must first present a prima facie case, and if successful, the

---

[37] Although Johnson mentions several instances in which her race was explicitly mentioned in a derogatory context, <u>see, e.g.,</u> [Doc. 36-2 at 105, 110], none of these instances occurred contemporaneously with any adverse action against her, and as such, they do not constitute direct evidence of discrimination. <u>See</u> <u>Lamothe v. Bal Harbour 101 Condominium Ass'n, Inc.</u>, 316 F. App'x 844, 846 (11th Cir. 2008) (per curiam) (unpublished); <u>Caper v. TWC Servs, Inc.</u>, 820 F. Supp. 2d 1339, 1347–48 (S.D. Fla. 2011); <u>see also</u> <u>Steger v. Gen. Elec. Co.</u>, 318 F.3d 1066, 1079 (11th Cir. 2003) (citations omitted) (noting that discriminatory comments by decision makers, even if they do not qualify as direct evidence of discrimination, may be circumstantial evidence of discrimination).

burden shifts to GCSD to articulate a legitimate, non-discriminatory and non-retaliatory reason for its actions. Berman v. Orkin Exterminating Co., 160 F.3d 697, 701 (11th Cir. 1998); see also Entrekin v. City of Panama City Fla., 376 F. App'x 987, 997 (11th Cir. 2010) (per curiam) (unpublished). This burden is "exceedingly light." Holifield v. Reno, 115 F.3d 1555, 1564 (11th Cir. 1997) (per curiam) (citation and internal marks omitted). If GCSD meets its burden of production, the inference of discrimination or retaliation is erased, and the burden shifts back to Johnson to show that GCSD's articulated reason is merely a pretext for discrimination or retaliation. Entrekin, 376 F. App'x at 997; Berman, 160 F.3d at 702. Despite this burden-shifting framework, the "ultimate burden of persuading the trier of fact that GCSD intentionally discriminated [or retaliated] against [Johnson] remains at all times with [Johnson]." See Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).

## A. Discrimination Claim

To establish a prima facie case of discrimination, Johnson must demonstrate that (1) she is a member of a protected class; (2) she was qualified for the job or job benefit at issue; (3) she was subjected to an adverse job action; and (4) her employer treated similarly situated employees outside of her class more favorably. Burke-Fowler, 447 F.3d at 1323; Rice-Lamar v. City of Ft. Lauderdale, Fla., 232 F.3d 836, 842-43 (11th Cir. 2000). "Demonstrating a prima facie case is not onerous; it

requires only that the plaintiff establish facts adequate to permit an inference of discrimination." Holifield,115 F.3d at 1562 (citations omitted); see also Burdine, 450 U.S. at 253-54. GCSD contends that, for the purposes of Johnson's discrimination claim, only the decision not to renew her contract constitutes an adverse employment action, [Doc. 35-1 at 6], and asserts that the discrimination claim fails as a matter of law because Johnson cannot show that similarly situated, non-protected employees were treated more favorably with respect to this adverse action, [Doc. 54-1 at 5].

1. *Adverse Employment Actions*

"[T]o prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a *serious and material* change in the terms, conditions, or privileges of employment." Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1239 (11th Cir. 2001); Jackson v. Blue Cross & Blue Shield of Ga., Inc., No. 4:09-CV-19 (CDL), 2010 WL 3062437, at *9 (M.D. Ga. Aug. 2, 2010). Accordingly, Johnson's assertion that she was discriminated against when she received negative performance evaluations, was placed on a PDP, was ignored by Dr. Parker, and when GCSD did not process her complaint according to policy have no merit as the record evidence shows that these events did not materially effect the terms and conditions of her employment. See Woolf v. City of Streetsboro, No. 5:09 CV 1570,

31

2010 WL 4105550, at *8 (N.D. Ohio Oct. 18, 2010) (holding that being ignored in the workplace does not constitute an adverse employment action in a sex discrimination case under Title VII); <u>Kelly v. Mills</u>, 677 F. Supp. 2d 206, 222 (D.D.C. 2010) (citations omitted) (holding that neither poor performance evaluations nor placement onto a PIP constituted adverse employment actions for purposes of Title VII's anti-discrimination provision); <u>Smith v. CA, Inc.</u>, No. 8:07-cv-78-T-30TBM, 2008 WL 5427776, at *7 (M.D. Fla. Dec. 30, 2008) (holding that placement onto a PIP was not an adverse employment action because it merely required plaintiff to improve his performance to comply with previously established expectations); <u>Runkle v. Gonzales</u>, 391 F. Supp. 2d 210, 224 (D.D.C. 2005) (citation omitted) (failure to properly investigate an employee's complaints does not constitute an adverse action where there is no evidence that the failure affected the terms and conditions of plaintiff's employment); <u>Beltrami v. Special Counsel, Inc.</u>, Civil Action No. 1:02-CV-2505-WBH-AJB, 2005 WL 6075365, at *8 (N.D. Ga. Feb. 11, 2005), adopted by 2005 WL 6075366, at *1 (N.D. Ga. Mar. 17, 2005); <u>Brown v. Sybase, Inc.</u>, 287 F. Supp. 2d 1330, 1342 (S.D. Fla. 2003) (relying on the fact that the performance improvement plan did not impose any tangible harm on plaintiff to find that it was not an adverse action); <u>Fitch v. Cont'l Cas. Co.</u>, No. 01 C 1149, 2002 WL 31834877, at *5 (N.D. Ill. Dec.

16, 2002).[38]  Accordingly, only Dr. Parker's decision to recommend that Johnson's contract not be renewed constitutes an adverse employment action for purposes of her discrimination claim.  See Saridakis v. S. Broward Hosp. Dist., 681 F. Supp. 2d 1338, 1348 (S.D. Fla. 2009) (finding non-renewal of a contract to be an adverse employment action for purposes of a Title VII discrimination claim).

## 2. *Similarly Situated Comparators*

"In order to establish the similar comparator element, the plaintiff and the employee she identifies as a comparator must be similarly situated in all relevant respects."  Anderson v. Dunbar Armored, Inc., 678 F. Supp. 2d 1280, 1314 (N.D. Ga.

---

[38] Some courts in this circuit have held that being placed on a PDP can constitute an adverse action.  See Murdick v. Catalina Mktg. Corp., 496 F. Supp. 2d 1337, 1356-57 (M.D. Fla. 2007); Warner-Stanton v. Blue Cross & Blue Shield of Ga., Inc., No. 4:04-CV-83 (CDL), 2006 WL 42145, at *5 (M.D. Ga. Jan. 6, 2006) (assuming placement on a performance improvement plan ("PIP") was an adverse action and evaluating the existence of a more favorably treated comparator).  In Murdick, the court reasoned that where negative performance reviews trigger placement on a PIP, and where plaintiff was ultimately terminated for failing to comply with that PIP, there was a genuine issue of material fact regarding whether the negative performance reviews and placement onto a PIP which led to the more tangible employment consequence constituted adverse actions and therefore survived summary judgment.  Id.  However, Johnson admits that "poor performance ratings and placement on a PDP are not, in and of themselves, adverse employment actions," [Doc. 43 at 7], and even if the Court were to consider them as such, Johnson has advanced no analysis of these events and provided no evidence that an individual outside of her protected class with her background and experience performed similarly and was not given negative reviews, or received several "needs improvement" ratings but was not placed on a PDP, and she has accordingly failed to show that a similar individual outside of her protected class was treated more favorably, see discussion, infra.

33

2009), adopted at 1289 (citations and internal marks omitted). "The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." Id. (citations omitted). "[F]actors which may be used to determine whether two employees are directly comparable [include]: (1) whether they held the same job description, (2) whether they were subject to same standards, (3) whether they were subordinate to the same supervisor and (4) whether they had comparable experience, education, and other qualifications." Gage v. Metro. Water Reclamation Dist. of Greater Chi., 365 F. Supp. 2d 919, 934 (N.D. Ill. 2005) (citing Ajayi v. Aramark Bus. Servs., Inc., 336 F.3d 520, 532 (7th Cir. 2003)); see also Hockman v. Westward Commc'ns, L.L.C., 282 F. Supp. 2d 512, 527-28 (E.D. Tex. 2003) (citation omitted) ("[E]mployees with different responsibilities, different supervisors, different capabilities, different work rule violations or different disciplinary records are not considered to be 'nearly identical.'").

"'In determining whether employees are similarly situated for purposes of establishing a *prima facie* case, it is [also] necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways.'" White v. Russell Corp., Civil Action No. 3:08CV401-SRW, 2009 WL 4827407, at *6 (M.D. Ala. Dec. 10, 2009) (quoting Holifield, 115 F.3d at 1562). "'The most important factors in the disciplinary context . . . are the nature

of the offenses committed and the nature of the punishment imposed.'" Id. (alteration in original) (quoting Silvera v. Orange Cnty. Sch. Bd., 244 F.3d 1253, 1259 (11th Cir. 2001)); see also Rioux v. City of Atlanta, Ga., 520 F.3d 1269, 1280 (11th Cir. 2008) (alterations, citations, and internal marks omitted) ("To determine whether employees are similarly situated, we evaluate whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways. . . . The quantity and quality of the comparator's misconduct must be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges."). "If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." Anderson, 2009 WL 2568062, at *24 (emphasis, citations, and internal marks omitted).

Johnson contends that she can show other, similarly situated employees engaged in nearly identical misconduct and were treated more favorably. Specifically, Johnson asserts that "she was treated differently than her African-American counterpart who satisfactorily completed her [PDP] requirements."[39]

---

[39] Johnson also asserts that she has "statistical evidence that indicates that whites were being treated differently has a whole and another white teacher experienced retaliation." [Doc. 43 at 5-6]. Although statistical evidence can be used to establish discrimination, it "must be 'finely tuned,'" Forehand v. Fla. State. Hosp. at Chattahoochee 89 F.3d 1562, 1575 (11th Cir. 1996) (citation omitted), and where the case is, as here, one of alleged discrimination against an individual, Johnson must

[Doc. 43 at 5]. However, an employee complying with her PDP is not an appropriate comparator for Johnson, as the record evidence shows that she was not complying with her employer's expectations at the time that the decision was made not to renew her contract.[40]  See [Doc. 33 at 157; Doc. 36 at 126-42; Doc. 35-5 at 13, 25].

_____

establish the size of the sample and the statistical significance of inexorable zero, see Woodson v. Pfizer, Inc., 34 F. App'x 490, 493 (7th Cir. 2002) (unpublished). Here, Johnson has not provided authenticated statistical evidence or pointed to evidence establishing the size of the sample or the statistical significance of any alleged disparate treatment, and her conclusory assertions of "statistics" and mistreatment of other white individuals accordingly will not suffice to create a genuine issue of material fact precluding summary judgment with respect to individual discrimination she alleges to have suffered.  See Blackledge, 2007 WL 3124452, at *20 (citations omitted) ("Although the percentages show some discrepancies in [the treatment of] Caucasian and African-American workers, there is no way to discern whether the discrepancies are the result of legitimate or racially-discriminatory variables because there are no measurable variables provided.").

[40] Although Johnson is correct that she received a satisfactory performance evaluation, see, e.g. [Doc. 35-5 at 26], this evaluation is irrelevant with respect to her performance at the time Dr. Parker made the decision to not recommend her contract for renewal, and therefore this evidence does not raise a genuine issue of material fact, much less establish, that her performance was actually satisfactory at the relevant time.  Moreover, merely receiving satisfactory evaluations does not establish that Johnson complied with the requirements of her PDP, which also required her to read certain books and attend certain classes, see [Doc. 35-5 at 16-18], and Johnson has provided no evidence that she complied with these requirements. In any event, Johnson's response to GCSD's summary judgment motion is completely devoid of analytic comparison between Johnson and this "African-American counterpart who satisfactorily completed her [PDP] requirements" and the record reveals no information about the relative background and qualifications of this individual, whom Johnson does not even identify by name, about evaluations that were made of this individual, or about the efforts undertaken by this individual to comply with her PDP, and Johnson has therefore not met her burden to show that this individual was similarly situated to her or raised any genuine issues of material

Johnson has not identified, nor does the evidence of record show, any individual outside of her protected class who had the same job description, was subordinate to the same supervisor, had comparable experience and qualifications, and was subject to the same standards as Johnson who was recommended for renewal after he or she received two negative performance evaluations, was put on a PDP, and failed to comply with the PDP prior to its expiration date.[41]  See Gage, 365 F. Supp. 2d at 934 (citation omitted); White, 2009 WL 4827407, at *6 (citation omitted).  Accordingly, as Johnson has not set forth other evidence of discrimination and has not identified record evidence permitting a reasonable fact finder to determine that an employee outside of her protected class with a similar work history engaged in a nearly identical behavior and yet was treated more favorably, it is **RECOMMENDED** that

---

fact regarding discrimination.   See Gage, 365 F. Supp. 2d at 934 (citation omitted).

[41] In fact, as pointed out by GCSD, the record evidence shows that, in general, teachers who complied with their PDPs, whether Caucasian or African-American, were recommended for renewal, but that those who did not comply with their PDPs, whether Caucasian or African-American, were not recommended for renewal.   See [Doc. 35-7 ¶¶ 16-18; Doc. 35-8 ¶ 37 (noting that two other special education teachers who did not comply with their PDPs, A. Williams and Griffin, were also recommended for non-renewal, and that another special education teacher, Clark, and a Caucasian eighth grade language arts teacher who complied with his PDP, were recommended for renewal)].   The treatment of these individuals, to the extent their experience and background render them appropriate comparators, does not provide circumstantial support for Johnson's allegations of discrimination.

GCSD's motion for summary judgment be **GRANTED** because Johnson has not established a prima facie case of discrimination.[42]

## B.    Retaliation Claim

### 1.    *Prima Facie Case*

To establish a *prima facie* case of retaliation under Title VII, Johnson must show that (1) she engaged in statutorily protected activity; (2) she suffered an adverse action; and (3) the adverse action was caused by her engaging in protected activity. Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008); Gregory v. Ga. Dep't of Human Res., 355 F.3d 1277, 1279 (11th Cir. 2004) (per curiam); Whitner v. Emory Univ., Civil Action File No. 1:06-CV-1518-TWT, 2008 WL 4224407, at *19 (N.D. Ga. Sept. 12, 2008), adopted in part at *1.  With respect to Johnson's retaliation claim, GCSD contends that Johnson cannot establish that she engaged in any protected activity under the statute and that even if she could, Johnson cannot establish the requisite causal connection between any protected activity and an adverse action. [Doc. 35-1 at 13-23].

---

[42] Even were the Court to conclude that Johnson could establish a prima facie case of discrimination, GCSD would still be entitled to summary judgment because, as discussed infra with regard to her retaliation claim, Johnson has failed to rebut GCSD's legitimate non-discriminatory reason for not renewing her contract.

### a. Protected Activity

"Protected activity" under Title VII can take the form of either opposition to an employer's unlawful employment practice or participation in a proceeding under Title VII.  See 42 U.S.C. § 2000e-3(a).  Title VII defines an "unlawful employment practice" as, *inter alia*, discrimination against an employee "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e -2(a)(1).  Thus, only opposition to discrimination on the basis of race, color, religion, sex, or national origin, the categories protected by Title VII, constitutes "protected activity."  See Sridej v. Brown, 361 F. App'x 31, 35 (11th Cir. 2010) (per curiam) (unpublished) (citations omitted).

GCSD contends that Johnson cannot establish a retaliation claim because all the actions she complains of took place prior to the filing of her EEOC charge.  See [Doc. 35-1 at 14-16].  However, contrary to GCSD's assertions, filing a charge with the EEOC is not the only statutorily protected expression which constitutes opposition to an unlawful employment practice.  See Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn., 555 U.S. 271, 276 (2009) (identifying communication to the employer of a belief that the employer has engaged in a form of employment discrimination as constituting opposition under Title VII).

Accordingly, Johnson first engaged in statutorily protected expression when she complained verbally to Dr. Parker about racial discrimination at the October 27, 2009, meeting,[43] and thereafter as she pursued that complaint via response to her

---

[43] The parties dispute whether the complaint raised by Johnson complied with GCSD's grievance policy and adequately put GCSD on notice of the alleged discrimination. See [Doc. 33 at 60-64, 86-90, 92-94, 100-01, 106-07, 113 (Parker testifying he did not believe the comments were an official complaint and were "accusations" not reports of racism); Doc. 36 at 143-44, 175-88 (Johnson asserting that she officially complained during the meeting)]. Moreover, the grievance policy itself contains conflicting information about whether an oral complaint like the one made by Johnson is sufficient to put the employer on notice under the policy. Compare [Doc. 35-5 at 37 (noting that the employee "must present a complaint in person and/or writing" to his or her immediate supervisor within 10 days of the most recent incident upon which the complaint is based), with [id. at 36 (stating that "[t]he initial complaint shall be in writing")]. Because this conflict presents a genuine issue of material fact and the evidence must be viewed in the light most favorable to Johnson, Adickes, 398 U.S. at 157; Knight, 330 F.3d at 1316, the Court will presume that Johnson engaged in protected activity when she verbally complained of discrimination to Dr. Parker in the October 27, 2009, meeting.

PDP, a written letter and in her meeting with Spraggs.[44]  See [Doc. 36 at 143-44, 171, 180-84].

For a complaint "to satisfy the 'statutorily protected expression' requirement, a 'plaintiff must show that [she] had a good faith, reasonable belief that the employer was engaged in unlawful employment practices.'"  Van Portfliet v. H & R Block Mortg. Corp., 290 F. App'x 301, 303 (11th Cir. 2008) (per curiam) (unpublished) (citing Weeks v. Harden Mfg. Corp., 291 F.3d 1307, 1311 (11th Cir. 2002) (citations omitted)); see also Adams v. Cobb Cnty. Sch. Dist., 242 F. App'x 616, 621 (11th Cir. 2007) (per curiam) (unpublished) (citation omitted); [Doc. 35-1 at 9 (defendant arguing that Johnson's complaints were not reasonable)].  In other words, Johnson "must show not only that [she] subjectively believed [she] was being discriminated against . . . but also that [her] belief was objectively reasonable in light of the facts and record presented."  Adams, 242 F. App'x at 621 (emphasis, citation, and internal

_____

[44] Johnson testified as to other allegedly discriminatory instances occurring prior to the October 27, 2009, meeting, and mentions that it was "highly likely" she reported those events to Green earlier in the 2009-2010 school year.  See, e.g., [Doc. 36 at 110].  However, Johnson has submitted no corroborating evidence or details in support of this self-serving testimony and it is therefore insufficient on its own to create a genuine issue of material fact regarding this element of a prima facie retaliation case.  See Wallace v. Teledyne Cont'l Motors, 138 F. App'x 139, 143 (11th Cir. 2005) (per curiam) (unpublished); Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991) (stating that evidence consisting of conclusory allegations does not defeat summary judgment); Evers v. Gen. Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985) (citations omitted) ("[C]onclusory allegations without specific supporting facts have no probative value.").

marks omitted).  "The reasonableness of the employee's belief is measured against existing substantive law."  <u>Van Portfliet</u>, 290 F. App'x at 303 (<u>citing</u> <u>Clover v. Total Sys. Servs., Inc.</u>, 176 F.3d 1346, 1351 (11th Cir. 1999)).  As such, "the opposed conduct must be close enough [to unlawful] to support an objectively reasonable belief that it is."  <u>Id.</u> (alteration in original) (citation and internal marks omitted).

The Court finds that Johnson had a subjective belief that she was being discriminated against and that the challenged conduct was close enough to unlawful to render her belief objectively reasonable.  Viewing all the evidence in the light most favorable to Johnson, <u>Adickes</u>, 398 U.S. at 157; <u>Knight</u>, 330 F.3d at 1316, an individual who had been told "shut up white teacher no one cares what you have to say" in a staff meeting and to "go back where you came from you old white teacher," and who had heard Green tell one African-American teacher with whom she had experienced previous racial conflicts[45] that "she would take care of [Johnson]," <u>see</u> [Doc. 36 at 85-113], and who was then given needs improvement ratings by Green in areas which she felt were unwarranted, <u>see</u> [<u>id.</u> at 122-34], could reasonably believe that the actions being taken against her were on the basis of her race.  Accordingly, for the purposes of this motion, the Court will consider that Johnson engaged in protected expression when she verbally complained to Dr. Parker about

_____

[45] <u>See</u> [Doc. 36 at 110-15, 192 (describing previous alleged racial incidents with Tate)].

racial discrimination at the October 27, 2009, meeting, and thereafter as she pursued that complaint via written letter and in her meeting with Spraggs.  See [Doc. 36 at 143-44, 171, 180-84].

**b.    Adverse Action**

Under Title VII's retaliation provision, an adverse action is any action that would "likely have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Burlington N. & Sante Fe Ry. Co. v. White, 548 U.S. 53, 60-61, 64-65 (2006) (citations and internal marks omitted) (identifying this standard as an objective one).  Therefore, contrary to GCSD's assertions, see [Doc. 35 at 17-18], an adverse action for the purposes of a retaliation claim, unlike a discrimination claim, need not necessarily generate a serious and material change in the conditions or privileges of employment.  For the purposes of a retaliation claim, "whether a particular [action] is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances."  Id. at 70-71.  Under the circumstances here, where Johnson's negative evaluation resulted in her placement on a PDP which resulted in the ultimate non-renewal of her contract, each event can be considered an adverse action for the purposes of Johnson's retaliation claim.[46] See

_____

[46]  However, "an employer's failure to investigate a complaint of discrimination cannot be considered an adverse action taken in retaliation for the

Cain v. Geren, 261 F. App'x 215, 217 (11th Cir. 2008) (per curiam) (unpublished)

(noting that negative performance evaluations can constitute adverse actions for the

purpose of a Title VII retaliation claim where they lead to more tangible job

consequences); Johnson v. Bibb Cnty. Bd. of Educ., No. 5:07-CV-425 (CDL), 2009 WL

1885052, at *7 (M.D. Ga. June 29, 2009) (finding non-renewal of a contract to be

adverse action for Title VII retaliation claim); Smith v. Quintiles Transnat'l Corp., 509

F. Supp. 2d 1193, 1203 (M.D. Fla. 2007) (finding placement onto a PIP to be an

adverse employment action for the purposes of plaintiff's Title VII retaliation claim

where implementing the PIP "resulted in an increased workload, increased reporting

requirements, and increased supervision" and "temporarily prevented the Plaintiff

from receiving pay raises or bonuses").

However, because Johnson must show that her protected activity caused an

adverse action to be taken against her, see Crawford, 529 F.3d at 970, the only

adverse actions which are relevant to her retaliation claim are those that occurred

after she first engaged in protected activity on October 27, 2009, see Long v. Russell

Cnty. Comm'n, Nos. 3:09-CV-90-WKW [WO], 3:09-CV-96-WKW [WO], 2010 WL

---

filing of the same discrimination complaint." Fincher v. Depository Trust & Clearing
Corp., 604 F.3d 712, 721 (2d Cir. 2010).  Similarly, Johnson's allegations that Dr.
Parker ignored her after her complaint of discrimination is "more of a minor slight
than a materially adverse action." Davidson-Nadwodny v. Wal-Mart Assocs., Inc.,
Civil Action No. CCB-07-2595, 2010 WL 1328572, at *8 n.6 (D. Md. Mar. 26, 2010)
(citing Burlington N. & Sante Fe Ry. Co., 548 U.S. at 68).

5391603, at *18 (M.D. Ala. Dec. 27, 2010) (citing Cobb v. TSI Telecomms. Servs. Inc., 172 F. App'x 293, 294 (11th Cir. 2006) (per curiam) (unpublished)). Therefore, the undersigned will only consider the decision not to renew Johnson's contract as an adverse action for purposes of her retaliation claim.[47]

### c. Causal Connection

Because the facts before the Court show that the final decision to not renew Johnson's contract was made by Superintendent Wilbanks on the basis of Drs. Parker and Camp's recommendations, see [Doc. 35-11 ¶ 12], the "cat's paw" theory of causation is applicable here. See, e.g., Hanford v. Geo Grp., Inc., 345 F. App'x 399, 406 (11th Cir. 2009) (per curiam) (unpublished) (applying cat's paw theory of causation where ultimate decision is based on another supervisor's recommendation). Cat's paw liability permits a plaintiff to establish causation where the final decision maker is "a mere conduit to give effect to [the]

---

[47] Johnson also received a negative evaluation from Allen after she first complained of discrimination to Dr. Parker in the October 27, 2009, meeting. [Doc. 35-5 at 25]. However, it is undisputed that Johnson never made any complaints of discrimination to Allen, see [Doc. 35-9 ¶ 24; Doc. 35-10 ¶ 17], and "[a]t a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took the adverse employment action," Clover, 176 F.3d at 1354. As Johnson has not advanced any arguments implicating Allen in the alleged discrimination or retaliation against her, and has not pointed to any evidence that he was aware of her complaints at the time he evaluated her, the Court does not find that his negative evaluation in November of 2009 can form the basis of Johnson's retaliation claim. See also [Doc. 36 at 145 (Johnson testifying that she did not believe Allen had any racial animus against her)].

45

recommender's discriminatory animus." <u>Ross v. Baldwin Cnty. Bd. of Educ.</u>, Civil Action No. 06-0275-WS-B, 2008 WL 820573, at *7 (S.D. Ala. Mar. 24, 2008) (citation omitted); <u>see also</u> [Doc. 41 ¶ 8 (asserting that the final decision to hire or fire is just a "rubber stamp" of Dr. Parker's recommendation)]. Under this theory, "the [retaliatory] animus of the recommender can be imputed to the decisionmaker when the decisionmaker does not conduct his or her own investigation." <u>Ross</u>, 2008 WL 820573, at *7 (<u>citing</u> <u>Stimpson v. City of Tuscaloosa</u>, 186 F.3d 1328, 1332 (11th Cir. 1999) (per curiam); <u>Williams v. Ala. Dep't of Transp.</u>, 509 F. Supp. 2d 1046, 1059 (M.D. Ala. 2007)); <u>see also</u> <u>Hampton v. City of S. Miami</u>, No. 03-22323-CIV, 2005 WL 5993476, at *11-12 (S.D. Fla. July 29, 2005). Accordingly, because there is no evidence that Superintendent Wilbanks, the final decision maker, undertook any sort of independent investigation into the sufficiency of Johnson's performance, he could be found to have "merely rubber stamp[ed] the recommendation," <u>Williams</u>, 509 F. Supp. 2d at 1060, and Johnson can establish a prima facie case of retaliation if she can show a causal connection existed between Dr. Parker's recommendation and her protected activity.

"To establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct and that the protected activity and the adverse action were not wholly unrelated." <u>Gupta v. Fla. Bd. of Regents</u>, 212 F.3d

571, 590 (11th Cir. 2000), <u>abrogated on other grounds as recognized</u> by <u>Crawford</u>, 529 F.3d at 974 (internal marks omitted). The causal connection may be established either through direct evidence of retaliatory animus, or by circumstantial evidence, including a showing that the plaintiff suffered the adverse actions shortly after engaging in the protected activity. <u>See Sumner v. U.S. Postal Serv.</u>, 899 F.2d 203, 209 (2d Cir. 1990); <u>Soloski v. Adams</u>, 600 F. Supp. 2d 1276, 1362 (N.D. Ga. 2009), adopted at 1322 (citations omitted). "If temporal proximity, however, is the only evidence of causation to support the logical inference that the two events were related, the challenged decision must follow almost immediately after the protected expression to support the logical inference that the two events were related." <u>Soloski</u>, 600 F. Supp. 2d at 1363 (<u>citing</u> <u>Clark Cnty. Sch. Dist. v. Breeden</u>, 532 U.S. 268, 273 (2001)); <u>see</u> <u>Summers v. Winter</u>, 303 F. App'x 716, 720 (11th Cir. 2008) (per curiam) (unpublished) (holding that, without more, "a time gap of three months or more does not establish a causal connection"). However, "gaps of time, standing alone, do not preclude a plaintiff from producing enough evidence for a reasonable jury to conclude that protected [activity] was a substantial factor in the [adverse employment decision]." <u>Washington v. Kroger Co.</u>, 218 F. App'x 822, 826 (11th Cir. 2007) (per curiam) (unpublished) (second alteration in original) (internal marks omitted) (<u>quoting</u> <u>Stanley v. City of Dalton, Ga.</u>, 219 F.3d 1280, 1291 (11th Cir. 2000)).

The temporal proximity between Johnson's complaints of discrimination and Dr. Parker's decision not to recommend her contract for renewal is close enough to permit an inference of causation. Johnson engaged in protected activity when she continued to complain of racial discrimination by pursuing her complaint to the level of Spraggs, GCSD's equality compliance officer, on December 16, 2009. See [Doc. 36-2 at 177-78, 183-84, 187; Doc. 33 at 125-26]. Evidence before the Court shows that Dr. Parker recommended Johnson for non-renewal sometime in January of 2010, see [Doc. 33 at 157; Doc. 35-7 ¶ 15; Doc. 35-11 ¶ 12]. Considering the evidence in the light most favorable to Johnson, see Adickes, 398 U.S. at 157; Knight, 330 F.3d at 1316, this elapsed time of less than two months is enough to permit an inference of causation and establish a prima facie case of retaliation based on the non-renewal of Johnson's teaching contract, see Robinson v. LaFarge N. Am., Inc., 240 F. App'x 824, 829 (11th Cir. 2007) (per curiam) (unpublished) (citing Stanley, 219 F.3d at 1291) (finding prima facie evidence of causation where adverse action occurred two months after protected activity); Batts v. Silver Line Bldg. Prods. Corp., Civil Action File No. 1:08-CV-3355-WSD-ECS, 2010 WL 966860, at * 12 (N.D. Ga. Feb. 22, 2010), adopted by 2010 WL 966861, at *2 (N.D. Ga. Mar. 12, 2010). But see Williams v. Waste Mgmt., Inc., 411 F. App'x 226, 229-30 (11th Cir. 2011) (per curiam)

(unpublished) (finding that two months was not "very close" and therefore did not suffice to establish a prima facie retaliation claim).

## 2. *Legitimate Reasons and Pretext*

Since Johnson can establish a prima facie case of retaliation, and presuming she could establish a prima facie case of race discrimination, the burden shifts to GCSD to present a legitimate non-retaliatory and non-discriminatory explanation for recommending non-renewal of her contract. Berman, 160 F.3d at 702. GCSD asserts that the decision to not renew Johnson's contract was made as a result of her overall poor performance, including poor evaluations and the fact that she did not fulfill all the requirements of her PDP. [Doc. 35-1 at 7; Doc. 33-1 at 142-43]; see Cuddeback v. Fla. Bd. of Educ., 381 F.3d 1230, 1236 (11th Cir. 2004) (performance issues constitute a legitimate non-discriminatory reason to take an adverse action). Because GCSD has articulated in a reasonably specific manner a legitimate non-discriminatory and non-retaliatory reason for the adverse actions, the burden shifts back to Johnson to show that the reason provided by GCSD is a pretext for prohibited conduct. See Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998).

"To establish pretext, a plaintiff must present concrete evidence in the form of specific facts showing that the defendant's proffered reason was pretextual." Bryant v. Averitt Express, Inc., 375 F. App'x 942, 943 (11th Cir. 2010) (per curiam)

(unpublished) (citations and internal marks omitted). "Ultimately, an employee must meet the employer's stated reason 'head on and rebut it, and [he] cannot succeed by simply quarreling with the wisdom of that reason.'" Young, 432 F. App'x at 917 (alteration in original) (citation omitted). In order to directly attack GCSD's reasons, Johnson must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Cooper v. S. Co., 390 F.3d 695, 725 (11th Cir. 2004) (quoting Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997)), overruling on other grounds recognized by Andrews-Willmann v. Paulson, 287 F. App'x 741 (11th Cir. 2008) (per curiam) (unpublished). The relevant inquiry in evaluating pretext evidence is not "whether the employer's determination was correct, but whether it constitutes an 'honest explanation' for [the adverse action]." Lowry v. Regis Salons Corp., No. 1:05-cv-1970-WSD, 2006 WL 2583224, at *19 (N.D. Ga. Sept. 6, 2006), adopted at *3 (citing Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000)). "Pretext means more than a mistake on the part of the employer; pretext means a lie, specifically a phony reason for some action." Tolley v. United Parcel Serv., No. Civ.A.1:05CV606TWT, 2006 WL 486523, at *5 (N.D. Ga. Feb. 27, 2006) (citations and internal marks omitted). "Thus, the inquiry is limited to whether the employer

offered an honest, [non-retaliatory and non-discriminatory] explanation for [the alleged retaliatory and discriminatory action], regardless of whether the decision might have been mistaken." Id. (citations omitted).

Johnson attempts to rebut GCSD's proffered explanation by asserting that her performance was not deficient since "both Dr. Parker and [] Green signed an evaluation **after** her contract was recommended to not be renewed that she had met all of her requirements as a teacher as of April 1, 2010."[48] [Doc. 43 at 8]. Accordingly, Johnson contends that GCSD's position that she had two unsatisfactory evaluations, was recommended for non-renewal and then "miraculously, [her] performance bec[a]me[] satisfactory" is "implausible." [Id.]. Similarly, she contends that completion of the PDP cannot be a factor in her non-renewal because "the PDP was no longer applicable [at the time of the April evaluation.]"[49] [Id. at 9].

---

[48] The evidence forming the basis of this assertion, Johnson's 2009-2010 annual evaluation, [Doc. 42-3], was not properly authenticated and therefore cannot be considered in evaluating this summary judgment motion. See discussion, supra. However, there is evidence on the record that Johnson also received a satisfactory evaluation from Mendez after her contract was recommended to not be renewed, see [Doc. 35-5 at 26], and accordingly the Court will consider Johnson's general argument that she met her employer's expectations after the decision not to renew her contract had been made.

[49] Johnson also contends that GCSD's "failure to follow its own policies and/or procedures when taking the adverse employment action against the plaintiff may serve as proof that [its] articulated reason for the action is pretext for discrimination and retaliation for making such claims." [Doc. 43 at 12]. While Johnson is correct that an employer's failure to follow its own policies may support

Johnson's argument fails to "meet the employer's stated reason head on and rebut it." Young, 432 F. App'x at 917 (citation and internal marks omitted). First, the fact that Johnson received a satisfactory evaluation after the alleged adverse employment action occurred is irrelevant and cannot be used to rebut GCSD's legitimate explanation for its earlier decision not to renew Johnson's contract and does not render that explanation "implausible." See Hammons v. Computer Programs & Sys., Inc. (CPSI), Civil No. 05-0613-WS-C, 2006 WL 3627117, at *3 n.9 (S.D. Ala. Dec. 12, 2006) (noting that facts which are unknown at the time the adverse employment action is taken are irrelevant to an assessment of whether that decision was fueled by animus).

Moreover, Johnson has pointed to no evidence on the record casting doubt on the fact that GCSD regarded her performance as deficient at the time her contract

---

an inference of pretext, see Ash v. Tyson Foods, Inc., 129 F. App'x 529, 533 (11th Cir. 2005) (per curiam) (unpublished), rev'd on other grounds 546 U.S. 454 (2006), she does not identify what policy GCSD failed to follow or provide any analysis as to how deviation from that policy demonstrates discriminatory or retaliatory animus, see Mitchell v. USBI Co., 186 F.3d 1352, 1355-56 (11th Cir. 1999) (per curiam) (citations omitted); Fitzhugh v. Topetzes, Civil Action No. 1:04-CV-3258-RWS, 2006 WL 2557921, at *10 (N.D. Ga. Sept. 1, 2006) (citations omitted) (noting that to show pretext, deviation from policy must occur in a discriminatory manner); see also Brown v. Am. Honda Motor Co., 939 F.2d 946, 952 (11th Cir. 1991) (citations omitted) ("It is difficult to hold that a practice which affects . . . all [individuals] in the same manner is actually designed to conceal a racially discriminatory [or retaliatory] motive."). Accordingly, this conclusory assertion does not serve to rebut GCSD's legitimate justification for its actions.

was not renewed. Although she makes the conclusory assertion that she complied with the requirements of her PDP, [Doc. 43 at 5], Johnson has submitted no corroborating evidence or details showing that she had addressed her supervisor's comments regarding student engagement in the manner proscribed by the PDP, had attempted to modify her lesson plans pursuant to the terms of the PDP, had completed the teacher observations required by her PDP, had read the books required for successful completion of her PDP, or had attended the Professional Development Sessions specified in her PDP at the time that Dr. Parker recommended her for non-renewal, see [Doc. 36-2 at 128-30, 133-40; Doc. 35-5 at 19; Doc. 35-8 ¶¶ 34-35], and her own self-serving deposition testimony is insufficient on its own to create a genuine issue of material fact regarding pretext, see Wallace, 138 F. App'x at 143; Avirgan, 932 F.2d at 1577; Evers, 770 F.2d at 986.

Finally, to the extent Johnson's contention that she had complied with her PDP amounts to an assertion that Dr. Parker's conclusion that her performance was deficient is simply wrong or unwise, she "cannot succeed by simply quarreling with the wisdom of [his decision]." Chapman, 229 F.3d at 1030; see also Alexander v. Fulton Cnty., Ga., 207 F.3d 1303, 1341 (11th Cir. 2000), overruleed on other grounds by Manders v. Lee, 388 F.3d 1304 (11th Cir. 2000) ("[I]t is not the court's role to second-guess the wisdom of an employer's decisions as long as the decisions are not

[unlawfully] motivated.").  As Johnson has failed to point to any record evidence creating a genuine issue of material fact regarding the non-discriminatory and non-retaliatory reasons proffered by GCSD for not renewing her contract, or identified any evidence showing that Dr. Parker or the GCSD officials considering his recommendation were motivated by discriminatory or retaliatory animus, she has failed to rebut GCSD's legitimate non-discriminatory and non-retaliatory reasons for its actions.  Thus, even if the Court concluded that Johnson could establish a prima facie case of discrimination, GCSD's motion for summary judgment on her discrimination claim would be due to be granted on this additional basis, and for the reasons stated, it is further **RECOMMENDED** that  GCSD's motion for summary judgment be **GRANTED** with respect to her retaliation claim.

## C.      Deprivation of Due Process under § 1983

In addition to seeking parallel relief under § 1983 and Title VII for discrimination and retaliation based on the previously discussed adverse employment actions, Johnson contends that Dr. Parker's failure to appropriately investigate her complaints of discrimination and provide her with access to the "Notice and Hearing" process violated her due process rights for which she seeks relief under § 1983.  See [Doc. 42 at 13-14].  Because GCSD is a governmental entity, it may not be held liable under § 1983 on a theory of *respondeat superior*.  Monell v.

Dep't of Soc. Servs., 436 U.S. 658, 691 (1978). "[T]o impose § 1983 liability on a [government entity], a plaintiff must show: (1) that [her] constitutional rights were violated; (2) that the [government entity] had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004) (citation omitted); see also Sauls v. Pierce Cnty. Sch. Dist., 399 F.3d 1279, 1287 (11th Cir. 2005) (citation omitted) ("To impose liability on a [government entity] under § 1983, the plaintiff must identify a [governmental] 'policy' or 'custom' causing the deprivation of federal rights."). GCSD asserts that it is entitled to summary judgment because Johnson cannot show that this alleged due process violation was the result of a custom or policy that constituted deliberate indifference to Johnson's due process rights. [Doc. 35-1 at 10-13]; see also McDowell, 392 F.3d at 1289.

There are two methods by which Johnson may establish GCSD's custom or policy: "identify either (1) an officially promulgated [] policy or (2) an unofficial custom or practice of the county shown through the repeated acts of a final policymaker . . . ." Grech v. Clayton Cnty., Ga., 335 F.3d 1326, 1329 (11th Cir. 2003). To establish a policy or custom, Johnson generally must show a persistent and widespread practice. McDowell, 392 F.3d at 1290. However, "where action is directed by those who establish governmental policy, the [state actor] is equally

responsible whether that action is to be taken only once or . . . repeatedly."  Pembaur

v. City of Cincinnati 475 U.S. 469, 481 (1986); see also Cooper v. Dillon, 403 F.3d 1209,

1221 (11th Cir. 2005).

Johnson has failed to show that one of GCSD's official policies or the decision

of a final policy-maker violated her constitutional rights.  First, § 1983 liability only

arises when "the violation of the plaintiff's federally protected right can be attributed

to the *enforcement* of a [governmental] policy," Mayard v. Siegfried, Civil No. 08-5853

(JRT/SER), 2011 WL 579334, at *5 (D. Minn. Feb. 8, 2011) (emphasis added) (citing

Monell, 436 U.S. at 694), and Johnson specifically argues that her constitutional rights

were violated because defendant did *not* follow GCSD's policy, see [Doc. 5 ¶¶ 20-24;

Doc. 43 at 13 (noting that "[t]he County had established procedures to ensure

discrimination was addressed" and that "Dr. Parker ignored these procedures[50]")].

---

[50] Johnson's arguments surrounding Dr. Parker's or Spraggs' disregard of
GCSD's policies on discrimination could be construed as a "failure to train" claim.
See [Doc. 35-1 at 11-13].  Failure to train employees on a policy can create § 1983
liability if that failure "amounts to deliberate indifference to the rights of persons
with whom the subordinates come into contact" and "actually cause[s] the injury of
which the plaintiff complains."  Belcher v. City of Foley, Ala., 30 F.3d 1390, 1397
(11th Cir. 1994) (quoting Popham v. City of Talladega, 908 F.2d 1561, 1564-65 (11th
Cir. 1990) (per curiam)); see also City of Canton v. Harris, 489 U.S. 378, 388-90 (1989)
(applying the same standard when specifically addressing governmental liability
under § 1983).  However, Johnson's complaint does not make any mention of
GCSD's alleged failure to train, see generally [Doc. 5], and the Court need not
consider new allegations at the summary judgment stage.  See Vela v. Village of
Sauk Village, No. 98 C 1199, 1999 WL 558125, at *10 (N.D. Ill. July 26, 1999) (refusing
to consider a failure to train claim advanced in summary judgment response when

Moreover, neither Dr. Parker, nor Spraggs, who are both alleged by Johnson to have decided not to investigate her complaints of discrimination, had final policymaking authority regarding GCSD's discrimination policy; the undisputed facts establish that the Board sets and interprets these policies and procedures. See GA. CONST. art. 8, § 5, ¶ 12; O.C.G.A. § 20-2-59; Wood, 420 U.S. at 326; [Doc. 33 at 17]. As there is no record evidence that refusing to investigate the discrimination complaints of white employees was so widespread as to become custom, see McDowell, 392 F.3d at 1290, the decision these individuals made cannot therefore result in § 1983 liability for GCSD. Accordingly, because Johnson has not brought forth evidence showing that compliance with GCSD's policies or actions taken by policymakers with final authority violated her constitutional rights, she has failed to make "a showing sufficient to establish the existence of an element essential to her case," Celotex Corp., 477 U.S. at 322, and it is **RECOMMENDED** that GCSD's motion for summary judgment be **GRANTED** with respect to Johnson's § 1983 claim for deprivation of due process.

_____

complaint did not allege failure to train); see also Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1314-15 (11th Cir. 2004) (per curiam). Moreover, the record evidence shows that all employees received annual training on the GCSD's discrimination policies and the complaint report process, [Doc. 35-7 ¶ 6; Doc. 35-11 ¶ 9 & Ex. 2; Doc. 36-1 at 53; Doc. 35-5 at 6]; see also [Doc. 33 at 16, 164-68, 214-15], and Johnson has not pointed to any other record evidence refuting this training or tending to show that GCSD had "deliberate indifference" to her rights, see Belcher 30 F.3d at 1397.

## IV. CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that GCSD's motion for summary judgment, [Doc. 35], be **GRANTED**.

The Clerk is **DIRECTED** to terminate this referral.

**IT IS SO RECOMMENDED**, this 17th day of October, 2012.

*Russell G. Vineyard*

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE